## No. 12,154.

### Toll, Trustee, *v.* Colorado National Bank of Denver et al.

Decided December 23, 1929.

Messrs. Grant, Ellis, Shafroth & Toll, Mr. C. Russell Shetterly, Mr. Stanley H. Johnson, for plaintiff in error.

Messrs. Bartels & Blood, for defendant in error bank.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

Though there are many defendants in error named in the writ, the Colorado National Bank alone entered an appearance in this court.

The proceeds of a foreclosure sale being insufficient to satisfy the claims of both the plaintiff in error and the Colorado National Bank, one of the defendants in error, we are called upon to determine the former's right to share in the proceeds. There is no dispute as to the facts. The Twin Lakes Land and Water Company executed a deed of trust to secure the payment of its principal note for $6,000 and the interest thereon. The note, which was dated December 1, 1925, was payable to the order of the Western Securities Investment Company on December 1, 1930. Two sets of interest coupons were executed. One set represented 6 per cent interest. These coupons were attached to the principal note. By endorsement the Colorado National Bank of Denver became the owner of the principal note, with the attached coupons. The other coupons, representing 1 per cent interest, were never attached to the principal note, but were retained by the

investment company until they passed into the possession of the International Trust Company in the following manner: The investment company executed what are called collateral gold notes. To secure the payment of the gold notes, it endorsed and delivered to the International Trust Company, in trust, the 1 per cent interest coupons above referred to, together with many other interest coupons not involved in this suit; and the investment company with the trust company, executed an instrument stating the nature and conditions of the trust. Later the trust company resigned as trustee and Henry W. Toll became its successor.

In the deed of trust given to secure the Twin Lakes Land and Water Company's note and interest it is stipulated:

"That in case of default in the payment of said principal or interest notes, according to the tenor and effect of the same, or either of them, or the interest thereon, or any part thereof, or of a breach or violation of any of the covenants or agreements herein, by the party of the first part, its successors or assigns, then and in that case the whole of said principal sum hereby secured, and the interest thereon at the time of sale, may at once, at the option of the legal holder or holders thereof, become due and payable, and the said premises be sold in the manner and with the same effect as if the said indebtedness had matured by lapse of time."

There being a breach of the agreement to pay taxes that were due, as well as a failure to pay interest, the bank exercised its option under the foregoing clause, and, on December 31, 1927, sued to foreclose as a mortgage the deed of trust securing the indebtedness. Toll, trustee, was made a party defendant. The court decreed a sale to pay, first, the court costs and the expenses of the sale, and then the amount of the indebtedness, including the amount of such of the interest coupons held by both the bank and Toll as had matured at the date of the decree, together with interest thereon; the payment of prin-

cipal and interest to be made proportionately, without priority as between principal and interest or as between the bank and Toll. The court refused to allow the claim of Toll to share in the proceeds of the sale to the extent of his unmatured interest coupons. Of this ruling Toll complains. The bank, by a cross-assignment of error, complains of the court's refusal to give the claim of the bank priority over Toll's claim. These objections present the two principal questions to be decided by the court. We will consider the bank's contention first, for if Toll is not entitled to share proportionately in the proceeds to the extent of his matured interest coupons, it follows, as a matter of course, that he would not be entitled to share proportionately in the proceeds to the extent of his unmatured interest coupons.

1. It is said that the circumstances attending the sale to the bank of the principal note, with the attached interest coupons, were such as to estop the Western Securities Investment Company from prorating with the bank; and that as that company, if it had sued to foreclose, could not prorate, Toll cannot prorate.

(a) To sustain the contention that the Western Securities Investment Company could not prorate with the bank, it is said that when the bank purchased the principal note, the Western Securities Investment Company delivered to the bank the principal note with the 6 per cent interest coupons attached, the trust deed, the insurance policy, a title opinion and a prospectus; that the bank believed that the documents thus delivered constituted all the papers relating to the loan; that the prospectus states that the loan is to net 6 per cent interest per annum, payable semiannually; that by this statement and certain ambiguities in the documents, the bank was made to believe that it was purchasing the entire loan; that "this would have been the belief of anyone except a person with an astute legal mind who had carefully gone through the fine print, carefully weighed the same and measured the possibilities of the peculiarly ambiguous

phrases''; and that ''it was a clever misrepresentation perpetrated through the means of ambiguity.''

Assuming, but not deciding, that, by reason of fraudulent misrepresentations or concealment by the Western Securities Investment Company it would be estopped to prorate with the bank; we are aware of no principle of law that would visit upon the innocent trustee, and through him upon the innocent gold note holders, the sins and shortcomings of that company. If that company were denied the right to prorate with the bank, it would be not because of any infirmity in the coupons, or any defect in the company's title thereto, or because of any other defense to the coupons, but because it would be unfair and inequitable, by reason of the company's fraud, to permit the company to prorate with the bank. The trustee and the gold note holders did not participate in the transaction between the company and the bank, and were not responsible for any misrepresentation or concealment by the company.

(b) But it is said that ''even if there had been no fraud or bad faith in the transaction, the Western Securities Investment Company, being the original mortgagee, there being no agreement, express or implied, that it should prorate, and it having sold part of the loan for its face value, could not prorate, and thus to its own advantage prevent its purchaser from procuring out of the security at least what it paid to the Western Securities Investment Company.''

Counsel quotes the following from the syllabus to *Georgia Realty Co. v. Bank of Covington,* 19 Ga. App. 219, 91 S. E. 267: ''Where several notes are secured by a mortgage or otherwise, and the holder of the security transfers one of the notes and retains the others, the transferee has a preference over the assignor if the security is insufficient to pay all the notes. The equity existing in favor of the assignee and against the assignor in such case is considered sufficient to create a preference in favor of the assignee.'' That principle could be in-

voked against the assignor, not as between two assignees or endorsees. The rule applicable to the present case is thus stated in another paragraph of the same syllabus: ''In the absence of an agreement or a special equity to the contrary, assignees holding separately several notes secured by a mortgage or otherwise are entitled to share pro rata, and without any preference, in the proceeds arising from the sale of the security, when insufficient to satisfy them all; and this is true, although the notes matured on different dates and the assignments were made at different times.'' Other cases cited by counsel for the bank are in accord with the Georgia case.

There is no legal obstacle to Toll's prorating with the bank to the extent of his matured interest coupons. In permitting him to so prorate, the trial court committed no error.

■ 2. The trial court also ruled correctly in denying Toll the right to prorate to the extent of his interest coupons that had not matured.

Counsel for Toll cite many cases to sustain the following statement of the law, quoted by them from 9 C. J., p. 49: ''Interest coupons payable to order or to bearer at a specified time and place, and which are attached to and represent the installments of interest accruing on a bond, are in legal effect negotiable promises for the payment of money, and when detached from the bond possess all the attributes of negotiable paper. Such coupons may be detached and negotiated separately by simple delivery, provided they are payable to order or to bearer; and this rule applies after the bond itself has been paid and satisfied as well as before. Coupons once detached and negotiated cease to be mere incidents of the bond and become independent claims, unless they refer to the bonds for their terms and conditions. The mere fact that coupons are declared to be for interest on bonds specified by their numbers does not destroy their negotiability when separated from the bond, nor impair the title of one purchasing from another without production of the bond.'' Re-

ferring to the argument of Toll's counsel, the attorneys for the bank pertinently say: "Their brief is a laborious and scholarly effort to show that the 1 per cent interest notes are valid negotiable instruments, and that the gold note holders can hold the maker personally liable at maturity. Well, what of it? Why argue that question? That does not give them security in the trust deed." An action to secure a personal judgment against the maker is one thing; a suit to foreclose a deed of trust, or to share in the proceeds of a foreclosure sale, is quite another thing. Counsel for Toll admit that if there were no interest coupons, or where, as in the case of the bank here, the interest coupons remain attached to the principal note, the holder, upon acceleration of the maturity of the indebtedness, would not be entitled to receive, out of the proceeds of a foreclosure sale, the amount of the unearned interest. In the present case the trial court allowed the bank matured interest, but not unmatured interest. Indeed, the bank did not claim the latter; if it had claimed it, the claim, of course, would have been disallowed. Not one authority is cited that sustains Toll's claim to share pro rata in the proceeds to the extent of his unmatured interest coupons.

Each coupon contains this statement: "Being on account of interest * * * on a principal note No. 3458 for the sum of $6,000, which principal note and this interest note are secured by trust deed of even date herewith." When one claims a lien by virtue of a deed of trust, he is bound by the provisions in the deed. The deed of trust involved in this suit contains the acceleration clause, quoted above, and also the following: "* * * the public trustee, out of the proceeds or avails of such sale * * * shall pay to the beneficiary hereunder, or to the legal holder of said notes, the said principal note or notes without priority, whether due and payable by the terms thereof or not, with *accrued* interest, rendering the overplus, if any, unto the said party of the first part * * *." Counsel for Toll argue that the words "or

notes'' mean interest notes. We do not think that such was the intention of the parties. Sometimes there is but one principal note, at other times there are several principal notes, secured by a deed of trust. The form of trust deed before us evidently was designed to be used in either case. In other parts of the deed of trust we find these expressions: ''* * * is desirous of securing the prompt payment of said promissory note [referring to the principal note] and said interest notes''; ''in case of default in the payment of the said principal or interest notes''; and again, ''said principal or interest notes.'' In several places, where it is obvious that the principal note and the interest notes are referred to, we find: ''the notes secured hereby''; ''legal holder of said notes''; ''the notes hereby secured''; again, ''holders of said notes''; ''the said notes and interest''; ''on or against said notes.'' Whenever the interest notes are intended to be referred to, the intention is clearly expressed. If it was the intention to require payment of the interest notes, whether due and payable by the terms thereof or not, the parties would have used apt words to express such intention; for example, ''the said principal note and the interest notes,'' or ''the said principal and interest notes,'' or ''the notes secured hereby.'' The use of the word ''or,'' in the provision in question, is significant. If the word ''interest'' were inserted between ''or'' and ''notes,'' as Toll's counsel, in effect, say should be done, the public trustee would be directed to pay to the legal holder of ''the said principal note *or* the interest notes''—that is to say, to the holder of either the principal note *or* the interest notes — ''without priority, whether due and payable by the terms thereof, or not,'' etc. Such a construction is inadmissible.

Toll is not entitled to prorate with the bank to the extent of his unmatured interest coupons.

█ 3. The principal note provides: ''* * * if any or either of said interest notes or any part thereof shall remain unpaid for ten days after maturity, it is expressly

agreed and understood that the legal holder or holders of this note may at their option, and without notice to the maker, declare the said principal sum to be due and payable.'' It provides, also: ''After maturity and default in the payment of the principal the same shall draw interest at the rate of twelve per centum per annum, until it shall be fully paid.''

The decree allowed the bank the penalty interest (twelve per cent per annum) from December 1, 1927. The interest note, concerning which there was a default, matured December 1, 1927. The principal, it is contended, could not be declared due until the expiration of ten days from that date. But, as we already have stated, there was a breach of the agreement to pay taxes that were due, and for such breach (which occurred September 16, 1927) the bank had the option to accelerate the maturity of the indebtedness, which option it exercised. The assignment of error based upon the allowance of interest cannot be sustained.

4. The decree allowed Toll reasonable attorney's fees, but did not provide that such fees shall be paid before the payment of the principal and interest. The deed of trust provides that ''the public trustee, out of the proceeds or avails of such sale, after *first* paying * * * attorneys' fees, * * * shall pay'' the indebtedness. The decree is hereby modified so as to give effect to this provision.

As modified, the judgment is affirmed.

Mr. Justice Adams, Mr. Justice Moore and Mr. Justice Burke dissent.

Mr. Justice Adams dissenting.

I concur in that part of the majority opinion which holds that Toll cannot share in the proceeds of the sale under foreclosure to the extent of his unmatured interest coupons, but I must dissent to his being allowed to prorate with the bank as to his matured interest coupons, or at all. I think Toll's matured interest should be subor-

dinated to the bank's principal note and matured interest. If I am correct in this, his attorney's fees in foreclosing a subordinate lien should not be superior to the bank's paramount lien. If I could believe that all liens were on a parity, I might have no difficulty in agreeing to the ruling as to his attorney's fees.

As stated in the majority opinion, there is no dispute as to the facts. Indeed, there is an agreed statement of facts, which has materially lightened the burden of the record, and although the facts are undisputed, the construction to be placed thereon is a matter of serious controversy. I have no doubt but that the majority of the justices felt that the facts are stated as fully as the opinion requires, but they hardly embrace matters of record which form the bases of principles on the application of which I disagree with the majority of the court. These considerations, as I look at them, loom so large in their relation to the case as a whole that I believe a proper sense of proportion calls for a statement in somewhat more detail, at least for the purpose of making my objections clear.

As indicated in the opinion, there are two sets or series of negotiable promissory notes involved. Their genuineness is undisputed. They were executed and delivered in December, 1925, by the Twin Lakes Land and Water Company, to the Western Securities Investment Company, payable to order, and thereafter endorsed and put on the market by the investment company. One of these series consists of the principal note for $6,000, together with semiannual 6 per cent interest coupons in the sum of $180 each, attached to the principal note, all held and owned by the Colorado National Bank of Denver. The other series comprises a set of 1 per cent semiannual interest notes. According to an undisputed statement in Toll's opening brief, the 1 per cent interest notes were executed and delivered by the Twin Lakes company as commission for the services of the investment company. They are called "commission notes," and are also re-

ferred to as "split interest notes." They are held by Toll in the manner hereinafter more fully stated.

In order to secure the payment of the principal note for $6,000 and "interest"—whatever the indefinitely expressed word "interest" may mean—the Twin Lakes company executed its deed of trust to the public trustee in Crowley county, covering the real estate to be sold under this foreclosure proceeding. This trust deed deserves special mention. While both series of notes are definite as to the rate of interest, the trust deed is indefinite in that it fails to specify any particular rate of interest. It says nothing about "commission notes," or "split interest notes." Whatever reference, if any, there may be in the trust deed, relating to such notes, is found in the general expressions therein, such as "notes" and "interest notes." There is nothing in the trust deed to indicate that it secures more than one series, or how many series of notes.

The investment company called itself "Farm Mortgage bankers," and did business on a large scale. In the conduct of its business it made other farm loans, secured by similar deeds of trust. It exploited an issue of its own notes, in denominations of $500 and $1,000 each, which it called "6½% Collateral Gold Notes," hereinafter called the "gold notes." Such notes, in a total par value of $175,000, were thereafter put on the market for sale, and $150,000 of them were disposed of to purchasers for value. As security, the investment company announced in a prospectus that there was deposited with the International Trust Company, as trustee, $192,500 of first farm mortgage interest notes, which it claimed to have acquired in its regular routine of business. The prospectus or circular contained this and other alluring representations, on which the purchasers of the gold notes relied. This $192,500 in security, as it is called, consists of 1 per cent interest notes, including those represented by the above Twin Lakes issue at that rate of interest. Toll evidently possesses a large quantity of them as trus-

540

tee, and this suit is to decide their fate. He became successor in trust to the International Trust Company after this suit was brought.

On July 10, 1926, some seventeen or eighteen months before this suit was commenced, the bank became, and is now, the holder in due course for value of the principal note for $6,000 and the 6 per cent notes. At the same time the investment company delivered to the bank the deed of trust, the insurance policy covering the buildings on the real estate, the title opinion relating to the property signed by the investment company's attorney, and a prospectus, which stated, among other things, "First Mortgage Loan * * * Twin Lakes * * *. To net 6% interest per annum, payable semiannually. Principal and interest notes are secured by a first deed of trust on 78 lots," etc. The bank believed that these documents thus delivered to it constituted all of the loan papers relating to this loan.

On July 10, 1926, when the investment company negotiated the principal and interest notes to the bank, it retained the split interest notes. The bank did not then know of the existence of these 1 per cent notes, nor was it aware of the existence of any outstanding notes purporting to be secured by the deed of trust, and it had no notice that they were in existence or outstanding, except such constructive notice, if any, as it had from the deed of trust which it then and there accepted. On September 29, 1926, the commission or split interest notes were deposited with the trustee, and thereupon became and now are a part of the collateral which secures the gold notes. September 16, 1927, default having occurred in the payment of taxes, the bank declared the indebtedness held by it immediately due and payable, in accordance with a provision in the deed of trust. December 27, 1927, default having been previously made in payment of the interest on the gold notes, all of such outstanding notes were declared immediately due and payable, pursuant to the provisions of the trust indenture between the in-

vestment company and trustee, and the trustee was vested with all of the authority therein set forth. The bank brought foreclosure suit on December 31, 1927, and Toll became successor in trust on January 25, 1928. Toll's collateral—the 1 per cent notes—are inadequate to secure the payment of the outstanding gold notes. Prior to the institution of this action, Toll and the International Trust Company were unaware of the representations, if any, of the investment company, in connection with the negotiation of the principal note involved in this action, or of any of the other principal notes given in connection with the other split interest notes which Toll holds as collateral under his substituted trust.

It is plain that neither the bank nor the International Trust Company, nor Toll, participated in the fraudulent concealment by the investment company of the fact that there were two outstanding series of notes purporting to be secured by the one deed of trust. However, in the light of present developments, only one inference can be drawn from the record as a whole, that the investment company sought to, and did, boost its sales of both series of notes by intentionally victimizing the holders of one or the other series, or both of them, by leading the bank, and others similarly situated, to believe that their security was an exclusive first lien, and by also leading the holders of the gold notes to also believe that the collateral 1 per cent split interest notes were also a first lien. The deed of trust used by the investment company was manifestly framed with this end in view. The question is, whether on the one hand the bank, or, on the other hand, the holders of the gold notes, with their "commission" or "split interest" notes, as collateral thereto, shall lose by the investment company's fraud. It does not involve the right of either the bank or Toll to participate in the proceeds of foreclosure, but only the relative rank of their respective liens.

I am unable to look with complacency on the light tread on the toes of the Western Securities Investment Com-

pany by "assuming but not deciding" that it was guilty of fraud. It was unquestionably guilty of a carefully systematized, gigantic swindle, that rocked the whole community, if not the state, and it calls for more than a glancing blow. No assumption of fraud is necessary. It stands out in bold relief, and I am confident that my associates would all agree with me had they felt that the cause required such a determination, but I think it does require it. I cannot but believe that the question of the fraudulent concealment and misrepresentations of the investment company to the investing public, including the bank, as well as the "gold note" holders, demands a yes or no answer, in order to determine the further question as to who should suffer. It is not enough to say that the holder or holders of the gold notes ought not to suffer for the wrongs of the investment company. It does not reach the point. Certainly, they ought not to suffer, if we assume that they were not chargeable with actual or constructive notice of the fraud—a dubious assumption, to say the least—but neither should the innocent holder of the $6,000 principal note and 6 per cent interest notes suffer by the prorating of their security with others. I wish that the woes of the parties might indeed be magically ameliorated by saying that they ought not to suffer, but we are all unhappily destitute of such a curative wand. One or the other of the parties *must* suffer, for the investment company has vanished with whatever may be left of its ill-acquired gains. Of necessity, whatever is awarded Toll must be taken from the bank, and vice versa. The issues are between them.

When the bank made its loan there was nothing in the title papers delivered to it to give warning of the fraudulent concealment and deceit of the investment company. The bank exercised every reasonable care, and with such precautions, a prospective buyer would be shocked to be informed that he was supposed to be sharing his security with other claimants. There was nothing to put the bank on further inquiry. The interest coupons were attached

to the principal note, the 6 per cent interest was an ordinary rate, and there was not the remotest suggestion of a second series. The representations, express and implied, repelled even the thought of such a thing. But the situation of the holders of the gold notes was different. They relied on the investment company's prospectus or circular in connection with the sale, but, as far as can be said, made no further inquiries as to title or security, notwithstanding the fact that they were warned by the trivial rate of interest of the commission notes that they *were* "split" (to use their attorneys' expression). They were thus notified that such notes could not represent the total interest, and that other notes of an unknown amount must be outstanding. A casual inspection would have betrayed the absence of any usual connecting link between the commission notes and the parent note, and afforded notice of the fact that they could never have been attached to the latter note, or have become an integral part of it and entitled to a first lien. These obvious guideposts, crowded in front of the purchasers of the split interest notes when they bought, were repeated danger signals that should have caused prudent men to halt, and to look before they leaped. They were solemn warnings that the holder of the parent note with interest coupons attached, must have relied, and had full right to rely, on the integrity of its security. It should not be penalized for the lack of diligence on the part of the trustee or his cestuis que trustent.

On the subject of the fraudulent concealment of the investment company, and on the question as to who should suffer because of notice of such fraud, in the final analysis, resort must be had for judicial construction of that instrument to which all had common access when they acquired their several holdings which are now under adjudication. This instrument consists of the publicly-recorded deed of trust. In the absence of ambiguity, to put the parties on a parity with each other, might be allowable under the decisions. The innocent or inadver-

tent omission of the rate of interest may not be unusual, but its deliberate omission from the deed of trust to conceal a surreptitious double series of notes was a serious breach of business usage and custom without lawful warrant or sanction. The taking of commission notes, in connection with regular principal and interest notes, when all are definitely mentioned, is not such a departure from usual business methods as to provoke comment. But if a second series of interest notes can be hid in the brush of general expressions such as "interest" or "interest notes" without express mention, a third or fourth series, or an indefinite number of interest notes, may be issued with equal impunity, each reducing the value of the security. I think that when not more than one series of notes is mentioned, only one is contemplated under the rule of certain and uniform usages and customs, and that this one series must be the commonly understood, ordinary principal note or notes, with interest intact, and not destroyed or "split" with a concealed knife. I am constrained to believe that Toll, trustee, and the gold note holders, and also all others interested, were chargeable with notice of this ordinary fact, when, contrary to all common business usages and customs, the deed of trust was conspicuously silent in respect to their novel claims to prorate. I fear that our majority decision marks an unfortunate innovation in commercial life that may serve to vex the business world in the uncertainty that it must engender among those who would make legitimate investments.

For the above reasons, I respectfully dissent in the particulars stated.

I am authorized to add that Mr. Justice Burke and Mr. Justice Moore agree with me in all that I have said.

As modified by the majority opinion, the judgment of the district court is affirmed.